FILED
2023 SEP 12 PM 12: 21
US DISTRICT COURT
EASTERN DIST. TENN.

|  |  |
|---|---|
| | ) Civil Action No. _____ |
| | ) |
| UNITED STATES OF AMERICA, THE | ) **\*\*FILED *IN CAMERA* AND UNDER** |
| STATE OF TENNESSEE, THE STATE OF | ) **SEAL PURSUANT TO 31 U.S.C. §** |
| VIRGINIA, THE STATE OF GEORGIA, *ex* | ) **3730(b)(2)\*\*** |
| *rel.* CHRISTOPHER MARSHALL AND | ) |
| TAMMY STRINGER | ) **NOT FOR PUBLIC DISCLOSURE** |
| | ) **DO NOT PLACE IN PRESS BOX** |
| Plaintiffs, | ) **DO NOT ENTER ON PACER** |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| CARIS HEALTHCARE, L.P., AND CARIS | ) |
| HEALTHCARE, LLC | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

*Qui tam* relators, Christopher Marshall ("Marshall") and Tammy Stringer ("Stringer")

(together, the "Relators"), by and through their attorneys, bring this action under the False Claims

Act, 31 U.S.C. §3729, *et seq.* (the "FCA"), the Tennessee Medicaid False Claims Act, Tenn. Code.

Ann. § 71-5-181, *et seq.* (the "Tennessee FCA"), the Virginia Fraud Against Taxpayers Act, Va.

Code Ann. § 8.01-216.1, *et seq.* (the "Virginia FCA"), and the Georgia State False Medicaid

Claims Act, Ga. Code Ann. § 49-4-168, *et seq.* (the "Georgia FCA"), on behalf of the United States

of America ("United States") and the States of Tennessee, Virginia, and Georgia (the "Plaintiff

States," together with the United States, the "Government") against Defendants Caris Healthcare,

L.P., and Caris Healthcare, LLC (together, "Caris" or "Defendants") and allege the following:

## INTRODUCTION

1.      This action seeks to recover damages and civil penalties arising from false claims

for reimbursement that Defendants submitted or caused to be submitted to the Government for

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| | ) Civil Action No. _____ |
| | ) |
| UNITED STATES OF AMERICA *ex rel.* | ) **FILED *IN CAMERA* AND UNDER |
| [UNDER SEAL] | ) SEAL PURSUANT TO 31 U.S.C. § |
| | ) 3730(b)(2)** |
| Plaintiffs, | ) |
| | ) **NOT FOR PUBLIC DISCLOSURE |
| v. | ) DO NOT PLACE IN PRESS BOX |
| | ) DO NOT ENTER ON PACER |
| [UNDER SEAL] | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

hospice services. The claims for payment were false because they were submitted on behalf of patients that were ineligible for hospice care.

2. There are two components to Defendants' scheme. First, Caris routinely approved ineligible patients for hospice care. Second, Caris repeatedly forced its employees to re-certify ineligible patients as being eligible for hospice care (i.e., certified that the patient is terminally ill with a life expectancy of six months or less if the disease runs its normal course), including previously eligible patients whose conditions had improved to the point that they could no longer be considered terminally ill.

3. As a result, Defendants' conduct violated the FCA, a federal statute that imposes liability for defined conduct in the nature of fraud, the submission of false claims, the use of false records and documents, and the failure to disclose material information, in presenting claims to Medicare, Medicaid, and other Government-Funded Healthcare Programs.

4. As explained herein, Relators allege that Defendants routinely and systematically engaged and continue to engage in a fraudulent scheme in connection with their hospice patients. In violation of the FCA, this scheme has caused the Government to pay for numerous false claims for reimbursement for hospice services provided to ineligible patients.

5. The Government-Funded Healthcare Programs, including Medicare and Medicaid, did not know about Defendants' fraudulent conduct. If they had, the Government would *not* have paid for the numerous false bills that Defendants submitted or caused to be submitted for reimbursement.

6. Accordingly, and for all the reasons stated herein, many of the claims for reimbursement that Defendants submitted or caused to be submitted to the Government for

2

reimbursement of hospice services were false in violation of the FCA because they were submitted on behalf of ineligible patients.

7.     Relators' allegations are based upon their own knowledge and an investigation by Counsel, which was undertaken on their behalf.

### JURISDICTION AND VENUE

8.     This is a civil action brought against Defendants on behalf of the United States to recover damages and civil penalties pursuant to the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730(b).

9.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and (b), which confer jurisdiction over actions brought under 31 U.S.C. §§ 3729 and 3730. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

10.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside, and/or transact business in this District and/or because acts proscribed by 31 U.S.C. § 3729 occurred within this District. This Court also has personal jurisdiction over Defendants because Defendants have systematically, continuously, and purposefully availed themselves to the privilege of doing business in Tennessee and in this District, and because many of Defendants' acts giving rise to the violations alleged herein occurred in Tennessee and in this District.

11.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because Defendants reside in this District, and many of the events or omissions giving rise to the violations of 31 U.S.C. § 3729, as alleged in the Complaint, occurred in this District.

12.     This action is not based upon the prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its

3

agent is a party, in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, in the news media, or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

13.     To the extent there has been a public disclosure unknown to Relators, they are an original source under 31 U.S.C. § 3730(e)(4)(B).

## PARTIES

14.     Relator Christopher Marshall is a citizen of the United States and a resident of Tennessee. He served as a Hospice Administrator at Caris from May 1, 2023, until June 13, 2023. During his employment at Caris, albeit brief, Relator Marshall was involved in all aspects of the administrative side of the business, including overseeing patient files. Relator Marshall began to work in the hospice industry in or around 2015 as an occupational therapist.

15.     Relator Tammy Stringer is a citizen of the United States and a resident of Tennessee. She is a hospice nurse who works with Caris' hospice patients. Relator Stringer has been employed by Caris since 2007. In her role as a hospice nurse, Relator Stringer works closely with Caris' patients and their families, including assessing patients' hospice care eligibility and continued eligibility.

16.     Defendant Caris Healthcare, L.P., is a Tennessee domestic limited liability partnership whose principal office address is 10651 Coward Mill Road, Knoxville, Tennessee 37931-3006. According to the Tennessee Secretary of State's Office, Caris Healthcare, L.P.'s mailing address is Suite A-301, 9000 Executive Park, Knoxville, Tennessee 37923-4685. The limited partnership is structured such that Caris and National HealthCare Corporation ("NHC") (a publicly traded Delaware Corporation) own both general and limited partnership interests in Caris.

4

17.     Defendant Caris Healthcare, LLC, is Caris Healthcare, L.P.'s wholly owned subsidiary.

18.     The United States of America is the real party-in-interest in this matter because the Government is the party who ultimately paid, and continues to pay, the false claims alleged herein. The Government paid the false claims through its operation and implementation of Medicare, a Government-Funded Healthcare Program. The United States of America is thus entitled to the bulk of the recovery sought by this action.

19.     The State of Tennessee is a real party in interest under the Tennessee FCA, Tenn. Code. Ann. § 71-5-181, *et seq.* and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

20.     The State of Virginia is a real party in interest under the Virginia FCA, Va. Code Ann. § 8.01-216.1, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

21.     The State of Georgia is a real party in interest under Ga. Code Ann. § 49-4-168, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

## APPLICABLE STATUTORY LAW

A.     **The False Claims Act**

22.     The False Claims Act provides, *inter alia*, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable on each such claim for a civil penalty . . . plus three times the amount of damages sustained by the United States." 31 U.S.C. § 3729(a)(1)(A)-(B).

5

23. For civil penalties assessed after January 29, 2018, whose associated violations occurred after November 2, 2015, the civil monetary penalties provided by law are not less than $11,181 and not more than $22,363 per false claim. 28 C.F.R. § 85.5.

24. The False Claims Act defines the term "claim" to mean "any request or demand . . . for money or property" that "(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

25. Requests for reimbursement submitted to the Government-Funded Healthcare Programs, such as Medicare and Medicaid, are considered "claims" for purposes of the FCA.

26. The False Claims Act defines the terms "knowing" and "knowingly" to mean, "with respect to information," a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

27. The False Claims Act also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim (a "false statement"). 31 U.S.C. § 3729(a)(1)(B). The False Claims Act defines the term "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

6

28.     The FCA allows any person having information about false claims violation to bring an action on behalf of the United States and to share in any recovery. The FCA requires that the complaint be under seal for a minimum of 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

29.     The FCA provides for the award of treble damages and civil penalties for knowingly submitting or causing the submission of false or fraudulent claims for payment to the federal government or for making or using false statements material to claims paid by the federal government. 31 U.S.C. § 3729(a)(1)(2).

**B.      The Medicare and Medicaid Programs**

30.     In 1965, Congress created Medicare, a federally funded health insurance program, primarily for the benefit of the elderly and certain categories of disabled persons. It is the nation's largest health insurance program, covering nearly 45 million people. Medicare is administered by a federal agency known as the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays doctors, as well as hospitals, pharmacies, and other types of healthcare providers and facilities–including hospice facilities—for their goods and services. Payments are set according to conditions and rates established by the Government.

31.     The Medicare Program is comprised of four parts. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes.

7

32. The benefits covered by Medicare Part A include hospice care, as defined in 42 U.S.C. § 1395x(dd). In 1982, Congress created the Medicare hospice benefit ("hospice"), which is designed to provide permanently ill patients with palliative care (i.e., care intended to optimize quality of life by preventing and relieving suffering) instead of curative care (i.e., care designed to cure an illness or condition).

33. Hospice pays for medical, nursing, social, psychological, emotional, and spiritual care intended to make terminally ill Medicare participants as physically and emotionally comfortable as possible prior to their death, while remaining primarily in the home environment. *See* 79 Fed. Reg. 26538, 26541 (May 8, 2014).

34. Hospice is not considered reasonable and necessary for a Medicare participant unless the patient is "terminally ill." As generally accepted by the medical community, the term "terminal illness" refers to an incurable, advanced, progressively deteriorating illness. *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013). Medicare defines "terminally ill" to mean that an individual has a "medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3.

35. To receive hospice, eligible Medicare participants must "elect" the benefit (i.e., it is *voluntary*). 42 C.F.R. § 418.24. By doing so, they waive their right to Medicare coverage of curative treatment for their terminal illness as well as related conditions. *See* 42 C.F.R. § 418.24(d).

36. Electing hospice care is often a critical decision for a Medicare participant because electing the benefit is electing to cease any further curative care for their terminal illness.

37. For example, a cancer patient who has a life expectancy of six months or less and elects hospice will no longer receive Medicare-covered treatment, such as chemotherapy, intended

8

to cure the cancer. Instead, the patient will receive palliative care designed to relieve only the pain and suffering associated with the patient's impending death.

38.     Companies can provide hospice care which is reimbursable by Medicare wherever the patient resides. It may be a private residence or a health care facility, such as a nursing home or an assisted living facility. If the hospice patient lives in a health care facility, the facility—not the hospice—will continue to provide for the patient's daily care needs.

39.     Since the inception of hospice, Medicare has paid hospice providers a fixed, per day, per level of care rate, which is intended to cover all hospice services needed to manage the end of life care of the terminal illness and related conditions. *See* 79 Fed. Reg. 26538, 26543 & 26553 (May 8, 2014). For patients receiving routine home care, the hospice is paid the same rate each day regardless of what, if any, services the hospice provides each day. *See* 79 Fed. Reg. 26538, 26553 (May 8, 2014).

40.     Medicaid was also created by Congress in 1965. *See* 42 U.S.C. §§ 1396-1396v. Medicaid is a public-assistance program that pays for medical expenses incurred by low-income patients. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. *See* 42 U.S.C. § 1396(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C.§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . ." *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

41.     Some Medicare enrollees that have limited income and limited resources are entitled to Part A benefits, as well as Medicaid benefits. These enrollees, often referred to as dual

9

eligibles, are entitled to benefits ranging from payment of certain costs, such as Medicare premiums, to full benefits under Medicaid. Whether entitled to full or partial Medicaid benefits, Medicare serves as the primary insurer and Medicaid as the secondary insurer for dual eligible participants.

### 1. Admission to the Medicare Hospice Program

42. For a patient's initial hospice admission, the hospice provider must obtain a certification of terminal illness for the individual from both the medical director of the hospice or a physician-member of the hospice interdisciplinary group ("IDG"),[1] and the individual's attending physician, if the individual has an attending physician. For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's IDG. *See* 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.22(c).

43. In order to receive hospice care, a patient's doctor and medical director of a hospice facility are required to certify that the patient is terminally ill and likely has less than six months to live. The patient must also sign a statement choosing hospice care rather than curative treatments. If the patient lives longer than six months, he or she can continue to receive hospice care as long as a doctor recertifies that the patient is still terminally ill with a life expectancy of less than six months.

44. A hospice agency is required to be certified by Medicare in order to receive Medicare payments. Under Medicare statutes and regulations, it must establish a plan of care for each patient based on that patient's specific needs. The services may include physician services,

---

[1] The interdisciplinary group generally consists of a physician, a registered nurse, a social worker, and a pastor or other counsel. 42 C.F.R. § 418.56. The IDG is responsible for developing and implementing an individualized plan of hospice care for each patient. *Id.*

10

nursing care, medical equipment and supplies, medications for symptom control and pain relief, home health aide and homemaker services, physical and occupational therapy, speech therapy, social work services, dietary counseling, grief and loss counseling for the patient and family, spiritual counseling, and short-term in-patient care.

## 2. Certifications for Hospice Care Reimbursement Under Medicare

45. All healthcare providers are obligated to comply with applicable requirements in order to be reimbursed by Medicare under Part A. When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services.

46. One purpose of the Medicare hospice requirements is to ensure that limited Medicare funds are properly spent on patients whose death is predictably impending and who require end-of-life care.

47. Accordingly, hospice companies are entitled to receive Medicare funding for hospice care *only* when such care is "reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. § 1395y(a)(1)(C).

48. Thus, in order to receive payment from Medicare, a hospice company must certify that the individual is, in fact, "terminally ill." *See* 42 U.S.C. § 1395f(a)(7). Even if initially eligible for hospice care, an individual should be discharged from the Medicare hospice benefit if he or she improves or stabilizes sufficiently over time while on hospice, such that the patient no longer has a life expectancy of six months or less. *See* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010).

49. As part of the certification requirements, the hospice must ensure that the medical record that hospice maintains for the individual contains clinical information and other

11

documentation that support that the individual is "terminally ill." *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22.

50.     Healthcare providers also must certify that they complied with all Medicare or Medicaid rules and regulations in order to qualify (be eligible) for the Medicare or Medicaid programs. *See, e.g.*, Form CMS 855A.[2] Thus, for example, in order to participate in the Medicare Program, all healthcare providers, including Defendants, must have submitted a Medicare Enrollment Application on Form CMS 855A. This form stipulates that providers agree to be familiar with, and abide by, the program's reimbursement policies.

51.     Here, Defendants falsely certified in their annual provider enrollment applications that they were knowledgeable regarding Medicare's requirements and would not knowingly or recklessly submit false claims for payment.

52.     Once enrolled in Medicare, in order to be paid for services rendered, all healthcare providers, including Defendants, must submit an electronic or hard-copy of a claim form called a "CMS-1450 form." When a hospice provider submits a Medicare hospice claim, it represents that it is entitled to payment for the claim.

53.     On the CMS-1450 form, the hospice provider must state, among other things, the patient's name, the diagnosis supporting the patient's admission to hospice, and the beginning and ending dates of the period covered by the bill.

54.     On the claim form, the provider certifies that the billing information on the claim is "true, accurate, and complete"; that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file"; and that "[r]ecords adequately describing services

---

[2] https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855a.pdf

will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law."

55.     Because it is not feasible for the Medicare program, or its contractors, to review every patient's medical records for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements, and trusts the providers to submit truthful and accurate claims.

56.     Once the provider submits its CMS-1450 form to the Medicare claims processor, in almost all cases, the claim is paid directly to the provider without any review of the patient's medical record.

57.     The physician certifications and clinical information in the medical record are submitted to the Medicare claims processor only if the claim is selected for medical review, which does not happen routinely.  If a hospice claim is selected for medical review, the hospice provider is required to submit to Medicare the physician certifications and clinical information in the medical record supporting the claim.

58.     The Medicare claims processor may not pay the claim if the clinical information that the hospice submits for medical review does not support that the patient is actually terminally ill and in need of hospice care.

59.     Federal law requires providers that receive funds under the Medicare program, to report and return any overpayments within specified time periods. 42 U.S.C. § 1320a-7k(d).

### 3.     Categories of Hospice Care

60.     Through Medicare, the United States reimburses hospice providers for services rendered to qualified beneficiaries on a per diem rate for each day a qualified beneficiary is enrolled.  Medicare makes a daily payment, regardless of the amount of services provided on a

13

given day, and even on days when services are not provided. The daily payment rates are intended to cover costs that hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering from a terminal illness.

61. Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: Routine Home Care ("RHC"), Continuous Home Care ("CHC"), Inpatient Respite Care ("IRC"), and General Inpatient Care ("GIC"). The four categories are distinguished by the location and intensity of the services provided and the base payments for each category reflect variation in expected input cost differences.

62. Routine Home Care is the most common level of hospice care. With this type of care, an individual has elected hospice care at their residence.

63. Continuous Home Care is provided for between 8 and 24 hours a day to manage pain and acute symptoms. CHC must be predominantly nursing care, supplemented with caregiver and hospice aide services and are intended to maintain the terminally ill patient at home during a pain or symptom crisis.

64. Inpatient Respite Care provides temporary relief to the patient's primary caregiver. IRC can be provided in a hospital, hospice facility, or a long-term care facility that has sufficient 24-hour nursing personnel present.

65. And finally, General Inpatient Care is provided for pain control or other acute symptom management that cannot feasibly be provided in any other setting. GIC begins when other efforts to manage symptoms are not sufficient. GIC can be provided in a Medicare certified hospital, hospice inpatient facility, or nursing facility that has registered nursing available 24 hours a day to provide direct patient care.

14

66.     Applicable provisions of federal regulations at 42 C.F.R. Part 418 and other federal regulations and statutes provide for payment to hospice agencies. These payments are based upon the level of care required by the Hospice patient. Unless a hospice provides CHC, IRC, or GIC on any given day, it is paid at the RHC rate. For any given patient, the type of care can vary throughout the hospice stay as the patient's needs change.

67.     In the 2022 fiscal year, Medicare pays $203.40 per day for RHC, $1,462.52 per day for CHC, $473.75 per day for IRC, and $1,068.28 per day for GIC.[3]

### 4.  Medicaid's Hospice Benefits

68.     Under its TennCare Medicaid program, Tennessee offers certain medical benefits to qualifying individuals, including hospice. The hospice benefit under TennCare is almost identical to that provided to Medicare beneficiaries under Medicare Part A. *See* https://www.tn.gov/content/dam/tn/tenncare/documents2/ben07001.pdf.

69.     Virginia likewise offers hospice and other medical benefits to qualifying individuals under its Medicaid program.

70.     Georgia likewise offers hospice and other medical benefits to qualifying individuals under its Medicaid program.

71.     The election, certification and recertification requirements under TennCare,[4] Virginia's Medicaid program,[5] and Georgia's Medicaid program[6] are substantially similar, and in

---

[3] https://www.nhpco.org/wp-content/uploads/FY2022_Hospice_Final_Rule_Reg_Alert_Revised_090221.pdf
[4] *See* https://www.tn.gov/content/dam/tn/tenncare/documents2/ben07001.pdf, at 2 ("TennCare follows the same certification procedures and election procedures, as well as statements of election, renovation, and change of hospices as used by Medicare.").
[5] *See* 12VAC30-60-130(A) (admission criteria), *available at* https://law.lis.virginia.gov/admincode/title12/agency30/chapter60/section130/
[6] *See* https://www.mmis.georgia.gov/portal/portals/0/staticcontent/public/all/handbooks/hospice%20services%2007%2001%2023%20sl%20-ppmanual%2020230705131307.pdf

15

many respects identical, to Medicare's requirements. Under both Medicare and Medicaid, the hospice benefit is only available to those persons who are terminally ill.

## FACTUAL ALLEGATIONS

72.     For many years, Caris has been a provider of services to federal healthcare programs, including Medicare. Caris entered into provider agreements with the Government to participate in each of these programs. Under the terms of those agreements, Caris agreed to comply with all the conditions imposed upon it by applicable federal and state laws and regulations, including the requirement that it submit claims for reimbursement only for products and services that were properly billed to the appropriate Government-Funded Healthcare Program and that the products and services were reasonable and necessary.

73.     Despite its representations to the contrary, on numerous occasions, Caris knowingly or with deliberate ignorance or reckless disregard for the truth, presented or caused to be presented, to an officer, employee, or agent of the United States, or a contractor thereof, false or fraudulent claims that were paid with federal funds and/or state funds. As described in detail below, the claims were false or fraudulent because they were presented, or caused to be presented, for hospice services for ineligible patients.

74.     As a result of Caris' submission of, or causing the submission of, claims that were knowingly false, or with reckless disregard or deliberate ignorance of their falsity, and/or their "knowing" concealment or avoidance of their obligation to the Government, the United States was damaged by reimbursing Caris for providing hospice care to patients who were not eligible for hospice benefit and by the omission of reimbursements from Caris.

75.     In addition to knowingly billing Medicare for patients who were ineligible for hospice benefit, Caris knew or recklessly disregarded the fact that its business practices would

16

cause the enrollment and provision of hospice services to ineligible patients, and thus the submission of false claims for the provision of hospice services to ineligible patients.

76.     Indeed, according to Relator Stringer, when a doctor referred a patient to be evaluated for admission to hospice to Caris, those patients were admitted 99% of the time, even if the patient did not meet criteria. In almost every single case—regardless of patient's condition—Caris admitted the patient for hospice care.

77.     This occurred because, despite being required to have a hospice medical director examine the patient to determine eligibility, Caris simply used the referring doctor's order as having seen them to determine that they have progressed enough to need hospice. However, the attending physician that referred the patient to Caris for evaluation was relying on Caris's expertise as a hospice care provider and for Caris to determine whether a patient was in fact eligible for hospice based on certain criteria.

78.     Relator further noted that even in cases where it was obvious that the patient was not eligible for hospice, Caris admitted the patients in order to get them on their census and bill Medicare or Medicaid for services.

79.     Further, Caris targeted for admission ineligible elderly patients with chronic conditions like debility, dementia, Alzheimer's, senile degeneration of the brain, and cardiac or pulmonary irregularities that, while serious, were not likely to lead to the death of the patient within six months. Doing so allowed Defendants to keep many patients on their hospice census for more than six months, *if not several years.*[7]

_____

[7] The average daily census is the number of patients cared for by a hospice on an average day. The census is an indicator of the hospice size.

17

80.     In addition to improperly admitting ineligible patients to hospice care, Caris kept patients on hospice care for long periods of time without medical justification and failed to immediately discharge patients who were no longer eligible for hospice benefits. Rather, Caris fabricated or exaggerated patients' medical conditions to improperly recertify them as eligible for continued hospice care, or were vague in their patient notes in order to not highlight any improvement a patient may have had in order to re-certify patients who were otherwise ineligible.

81.     The medical directors often signed certifications and re-certifications without examining the patient and only conducting a cursory review, if any, of patient medical records.

82.     Further, during IDG meetings when patients were reviewed for continued eligibility, instead of discharging ineligible patients, they often looked for a different diagnosis that would allow the patient to continue receiving hospice care. According to Relator Stringer, one such diagnoses Caris routinely uses to justify recertification of hospice patients that should be discharged from hospice care is "senile degeneration of the brain."

83.     These practices, independently and in conjunction with one another, resulted in the "knowing" admission and retention of patients who were ineligible for Medicare benefits and the submission of false claims to Medicare with respect to patients that were ineligible for the hospice benefit.

84.     Accordingly, the United States and the State Plaintiffs have suffered damages as a result of the false claims submitted, or caused to be submitted, by Caris and they are entitled to recover their losses and obtain other relief available under the FCA.

A. Billing For Ineligible Patients & Inflated Levels of Care

85.     Caris knowingly submitted or caused to be submitted false claims to Medicare for services to hospice patients who were not terminally ill, including patients who were no longer

18

terminally ill, and thus did not qualify for hospice benefits.

86.     Relators have direct and personal knowledge that Caris' patient population regularly exceeded the six-month prognosis. A review of documents related to patient care reveal that Caris approved ineligible patients for hospice care and repeatedly re-certified them as being eligible (i.e., certified that the patient is terminally ill with a life expectancy of six months of less if the disease runs its normal course).

87.     The foregoing practices contributed to the improper admission and retention of ineligible patients.

### 1.     Examples of Ineligible Patients Who Were Admitted and Retained on Defendants' Hospice Consensus

88.     The following patients are examples demonstrating that Defendants knowingly admitted, retained, billed, and failed to reimburse the Government with respect to patients that were ineligible for hospice.

89.     One such patient was **Patient A,** who was a male in his mid-90's when he initially became a hospice patient of Caris on September 29, 2022. According to records, Patient A received a diagnosis of malignant neoplasm of the intestinal tract. At the time of intake, his admission narrative claims that he was tired and weak and spent most of his time in bed. His intake notes also claim that he used a walker for short distances. In IDG notes from March 2023 regarding Patient A, it was noted that "[patient] has been discussed regarding extended stay with IDG tea with 1/28[/23] . . . . All team members agree LOS [length of stay] audit PDG [pending] submission and review with RDCC [Regional Director of Clinical Care] per SOP."

90.     Even if Patient A was initially eligible for hospice, however, a review of the narratives from the Nurse Practitioners' Attestation of Face-to-Face Encounter demonstrates that Patient A quickly *improved* from the time of admission. For example, on October 4, 2022, a nurse

reported that he was alert and oriented and had gone out with his wife and gotten a haircut. By January 2023, Patient A was working as a barber at his barbershop, was well nourished, denied any pain, and self-ambulated at home and used a cane when out in the community. On February 1, 2023, a nurse reported that Patient A was alert and oriented, ambulating on his own, taking baths himself, and continued to deny any pain. By March 21, 2023, Patient A had improved so much that he was no longer using a cane outside the house except for at church on Sundays because of long period of time standing. In addition, he was climbing 16 stairs to the second floor of his home where there is a closet that he utilized.

91.     In sum, the clinical record for Patient A did not support his continued terminal prognosis. Yet, despite acknowledging internally concerns that Patient A was not eligible for hospice, Defendants continued to re-certify Patient A. Patient A was re-certified for hospice benefits and, as of August 2023, was still obtaining hospice care from Caris.[8] Caris continuously billed Medicare for the ineligible hospice care of Patient A and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

92.     **Patient B** is a 93-year-old man with a diagnosis of Parkinson's Disease. He is a resident of The Trace, a National Healthcare Corporation[9] facility, and was enrolled in Caris' hospice program in November 2021. On May 8, 2023, Angie Best, who is a registered nurse and was at that time Caris' Regional Director of Clinical Care, Central Region, noted that Patient B had documentation reflecting improvement and was not meeting the local coverage determination for Parkinson's; he had a good appetite, was able to feed himself, and played Bingo.

---

[8] Relator noted that Patient A was discharged "by default" for a very brief period of time because he missed two consecutive appointments with his nurse. However, as of August 2023, Patient A has been re-admitted to hospice at Caris despite not meeting the criteria for terminal illness.
[9] As noted above, NHC has a financial interest in Caris.

20

93.     Despite the approximately *21 months* that Patient B has been under hospice service, the clinical record for Patient B did not support his terminal prognosis. Caris continuously billed Medicare for the ineligible hospice care of Patient B from admission to the date of this Complaint and did not report any overpayments or make any reimbursements to the CMS, Medicare, or Medicaid.

94.     Although Patient C has a diagnosis of senile degeneration of the brain, at her first re-certification in July 2023, her progress notes show no exacerbations and that patient's cognition has improved since admission. Patient C even questioned why she was in a hospice and in a memory unit and further confirmed her lucidity by providing a long list of things to which she is allergic. Indeed, Relator Stringer contends that Patient C was never eligible for services as her diagnosis was not terminal and should not have been admitted into hospice care. Despite the clinical care record for Patient C not supporting her terminal prognosis, Caris continuously billed Medicare for the ineligible hospice care of Patient C and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

95.     Similarly, **Patient D** is a female resident of the Meadows, an NHC facility, and began receiving hospice care from Caris on May 19, 2022, for a diagnosis of senile degeneration of the brain. As of August 2, 2023, Patient D had documented improvement and was no longer meeting the local coverage determinations. In fact, the notes from Patient D's recent evaluation noted that it was "most appropriate at this time to review for extended stay review." The clinical record for Patient D did not support her terminal prognosis. Patient D was ineligible for hospice care the majority of the benefit days that she received them. Caris continuously billed Medicare for ineligible hospice care of Patient D and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

21

96.     **Patient E** is an 86-year-old male that was admitted into hospice care at Caris on September 26, 2022 with a diagnosis of hypertensive heart disease with heart failure. The clinical notes do not support his terminal diagnosis. For example, on December 14, 2022, it was noted that Patient E walks daily and lifts weights so he can "get out of here." On January 25, 2023, the clinical notes for Patient E noted he has a stationary bike, lifts weights, and "has improved in stamina over the last 2-3 weeks." On February 7, 2023, his reviewing nurse again noted that Patient E uses a stationary bike to work out and that "[his] extended stay will be discuss[ed] at next meeting." The following month, on March 8, 2023, Patient E denied pain and his reviewing nurse noted extended stay should be discussed at the next IDG meeting due to "slow decline." Finally, on March 22, 2023, Patient E was discharged due to "condition improved, no longer considered terminally ill."

97.     In total, Patient E was in hospice care nearly six months before he was discharged as "no longer terminally ill." The clinical record for Patient E did not support his terminal prognosis. Patient E was thus ineligible for hospice care most of the benefit days. Defendant Caris continuously billed Medicare for ineligible hospice care of Patient E and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

98.     **Patient F** is a female resident of the Meadows and was initially admitted to hospice care on December 13, 2022, with a diagnosis of hypertension heart disease with heart failure. A review of the narratives from the Nurse Practitioners' Attestation of Face-to-Face Encounter demonstrates that Patient F quickly improved from the time of intake. Indeed, by May 8, 2023, Patient F was sitting up in a wheelchair, alert and oriented. By May 23, 2023, Patient F was at her baseline and had no complaints and no needs. By June 7, 2023, Patient F no longer needed oxygen supplementation. Her lungs were clear, and her oxygen saturation was at 98 on room air and she

22

was being reviewed for extended stay because she was no longer meeting the criteria. On August 2, 2023, Patient F denied being in any pain and reported appetite as "good." In sum, the clinical record for Patient F did not support her terminal prognosis. Upon information and belief, as of the date of this Complaint, Patient F is still in hospice care at Caris.

99. In total, Patient F has been in hospice for four benefit periods since she was admitted in December 2022. Patient F was ineligible for hospice care most of the benefit days. Defendant Caris continuously billed Medicare for ineligible hospice care of Patient F and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

100. Patient G is a 98-year-old female that was admitted to hospice care on December 15, 2021, with the diagnosis of senile degeneration of the brain, not elsewhere classified. Despite no decline in her health, Patient G has been in hospice for seventeen benefit periods (and as of August 2023 is still receiving hospice care from Caris). The clinical record for Patient G did not support her terminal prognosis. Thus, Patient G was ineligible for hospice care most of the benefit days. Defendant Caris continuously billed Medicare for ineligible hospice care of Patient G and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

101. Patient H is a 91-year-old female resident of the Meadows. She was admitted into hospice care on May 7, 2021, with a diagnosis of hypertensive heart disease with heart failure. A review of the narratives from the Nurse Practitioners' Attestation of Face-to-Face Encounter demonstrates that Patient H's health improved from the time of intake. In July of 2022, for example, Patient H was going to activities, was getting her hair done, keeping busy, and had a fair appetite. In August 2022, Patient H had not had any further decline. She had been out of bed daily and going to activities. She was eating in the dining room and was friendly with other patients. Despite her improvement, Patient H was not discharged and continued to receive hospice benefits.

23

102. On January 31, 2023, the nurse practitioner assessing Patient H noted that she was stable and was a candidate for possible discharge. On February 13, 2023, the nursing assessment again notes that Patient H was stable, had no further decline, and that plans to discharge her from hospice care had been initiated.

103. The very next day, on February 14, 2023, despite prior notes of improvement and potential discharge, in a sudden about-face, the diagnosis for Patient H was changed to senile degeneration of the brain and she was never discharged from hospice care. An assessment note from February 27, 2023, claims for the first time that there has been a decline in Patient H's cognition. According to Relator Stringer, Patient H was not eligible for hospice care under her initial diagnosis. However, instead of discharging her, Caris fabricated a diagnosis of senile degeneration of the brain for Patient H and continued to bill the Government for her hospice care.

104. According to nursing assessment notes dated April 25, 2023 – despite the new diagnosis of senile degeneration of the brain – Patient H was alert, awake, and plays Bingo regularly. The note claims that Patient H is being reviewed for discharge from hospice care.

105. On July 16, 2023, Angela Malach, a registered nurse at Caris, emailed Angela Robinson and Angela Best concerned about whether Patient H meets criteria and is eligible for hospice. In that email, following a face-to-face, Ms. Malach wrote:

> [Patient H] – she is also one with a diagnosis of Senile Degeneration of the Brain, I am not sure if she continues to meet the criteria, she is alert and oriented, she enjoys playing Bingo and wins. . . . She stays out of her room all day and attends activities and knows when they are planned. I believe we changed her from cardiac to Senile Degeneration of the brain but I am not sure she meets the criteria. . . .

106. Patient H was ultimately live discharged on July 25, 2023 due to "condition improved, no longer terminally ill."

24

107.     In total, Patient H received hospice care treatment at Caris for thirteen benefit periods – a period of *over two years* – even though the clinical records for Patient H did not support her terminal prognosis.  Patient H was thus ineligible for hospice care most of the benefit days.  Defendant Caris continuously billed Medicare for ineligible hospice care of Patient H and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

108.     **Patient I** is an 85-year-old resident of the Meadows admitted to hospice care on March 14, 2023, with a primary terminal diagnosis of senile degeneration of the brain.  On May 8, 2023, Angela Best, RN, and Director of Clinical Care, Central Region for Caris, sent an email to Relator Stringer admitting that it was inappropriate for Caris to have Patient I in hospice care for senile degeneration of the brain.  Consistent with Caris' scheme to admit – and retain – patients that were not hospice eligible, Ms. Best inquired as to whether there was "*a possibility of another terminal dx?*"

109.     In total, Patient I has been under hospice care for two benefit periods (and as of August 2023 is still receiving hospice care from Caris).  The clinical record for Patient I did not support her terminal prognosis.  Patient I was thus ineligible for hospice care most of the benefit days.  Defendant Caris continuously billed Medicare for ineligible hospice care of Patient I and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

110.     **Patient J** is a 93-year-old resident of the Belmont Village Assisted Living Facility was admitted into hospice care on October 1, 2021, for a diagnosis of terminal senile degeneration of the brain.  As of May 16, 2023, Patient J had been recertified *ten* times despite the clinic record not supporting her terminal prognosis.  According to Relator Stringer, Patient J's diagnosis was "chronic" and not likely to lead to her death within the next six months (i.e., not terminal).  Patient J was thus ineligible for hospice care the majority of the benefit days.  Caris continuously billed

25

Medicare for ineligible hospice care of Patient J and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

111.     **Patient K** is a 92-year-old male that was admitted into hospice care on February 26, 2020 with a diagnosis of terminal Neurocognitive Disorder with Lewy Bodies. A review of the narratives from the Nurse Practitioners' Attestation of Face-to-Face Encounter demonstrates that Patient K's health improved from the time of intake. On March 22, 2023, for example, Patient K had been stable for several months and it was recommended that a length of stay review be conducted. Despite his improvement, Patient K was not discharged and continued to receive hospice benefits despite ineligibility.

112.     In total, Patient K has been in hospice care for *twenty-one benefit periods* (and as of August 2023 is still receiving hospice care from Caris). The clinical record for Patient K did not support his terminal prognosis, but rather show that Patient K had a chronic illness. Patient K was thus ineligible for hospice care most of the benefit days. Defendant Caris continuously billed Medicare for ineligible hospice care of Patient K and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

113.     **Patient L** began receiving hospice care on December 29, 2022, for a diagnosis of terminal prostate cancer. As of June 20, 2023, Patient L had been recertified at least twice despite no deterioration of his condition. The clinical record for Patient L did not support Patient L's terminal prognosis. Caris continuously billed Medicare for ineligible hospice care of Patient L and did not report any overpayments or make any reimbursements to CMS, Medicare or Medicaid.

114.     **Patient M** is a 90-year-old female with a diagnosis of Alzheimer's. She was admitted into hospice on July 22, 2021, and has been re-certified *sixteen times*, for a total of seventeen benefit periods since her initial admission. Patient M's clinical record does not support

26

her terminal diagnosis, but rather demonstrates that Patient M has a chronic illness (i.e., one that is not likely to lead to her death within the next six months). Relator Stringer claims that she tried to discharge Patient M because she was not terminal and that her clinical notes demonstrated either a slow decline (i.e., chronic) or that she maintained status quo at several re-certs. However, her efforts were disregarded by the IDG. Accordingly, Patient M was ineligible for hospice care the majority of the benefit days. Caris continuously billed Medicare for ineligible hospice care of Patient M and did not report any overpayments or make any reimbursements to CMS, Medicare, or Medicaid.

### 2. Caris Directed Their Employees To Maintain Ineligible Patients

115.   As explained above, at the start of each benefit period, a physician must certify that the beneficiary is terminally ill and support the diagnosis with clinical information and documentation that support the diagnosis. *See* 42 C.F.R. § 418.22(b)(1) and (2). After the initial period of care, the hospice physician must continually recertify the patient as terminally ill every sixty days.

116.   While official Caris policy suggests that a hospice patient that does not meet the mandated criteria for hospice services should be discharged, in reality, hospice nurses and other staff receive resistance from Caris management when they actually try to discharge non-eligible hospice patients.

117.   According to Relator Stringer, the employees that conducted the mandatory face-to-face consultations with the patients in order to maintain eligibility for hospice care were told and pressured by Caris executives to exaggerate each patient's symptoms in a manner that highlighted a decline in order to get re-certified or to pick up additional diagnoses that kept those patients eligible for hospice care.

27

118.    Relator Stringer used to do what is known in hospice care as "length of stay audits," or "LOS" audit.  A "length of stay audit" is a process by which a patient's case notes and medical records are reviewed to determine whether there has been an improvement or deterioration in his or her medical condition and whether the patient still meets the hospice care eligibility criteria. Relator Stringer would include her honest assessment of the patients she was auditing and based on her observation of the patients, her training, and best medical judgment, would sometimes conclude that a particular patient no longer met the eligibility criteria and should be discharged from hospice care.   Relator Stringer would get pushback for making these recommendations and eventually the "length of stay audits" were taken over by another Caris employee. Relator Stringer was ridiculed and belittled for the honest way in which she conducted "length of stay audits."

119.    The reason for these directives is obvious:  money.  Indeed, when Relator Marshall began to question why non-terminal patients were being allowed to remain in hospice care unnecessarily for so long, he was told by Caris' Regional Director Sunday Watson "not to rock the boat" and that Caris could not "afford to be losing any patients or [we] would lose out on quarterly bonuses."

120.    Relators and other Caris employees were continuously reminded from top levels, including from Ms. Watson, not to discharge a patient that is no longer hospice appropriate. Instead, they were instructed to "find a different diagnosis code" to keep the patient eligible.

**RELATORS ARE ORIGINAL SOURCES**

121.    There are no bars to recovery under 31 U.S.C. § 3730(e), or, in the alternative, Relators are original sources as defined therein.

122.    Relators have direct and independent knowledge of the information on which the allegations are based.

123.    To the extent that any allegations have been publicly disclosed, Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations, and have voluntarily provided this information to the Government prior to filing this action.

124.    As required pursuant to 31 U.S.C. § 3730(e), Relators have voluntarily disclosed to the Government the facts on which the allegations in this Complaint are based prior to filing this action.

125.    As required by 31 U.S.C. § 3730(b), Relators have served upon the Attorney General of the United States and the United States Attorney for the Eastern District of Tennessee, contemporaneously with the filing of this action, a copy of the complaint and written disclosure of substantially all material evidence and information that Relators possess.

126.    This Complaint details Relators' discovery of, and investigation into, Defendants' fraudulent schemes, and is supported by documentary evidence.

<u>COUNT I</u>
**Violation of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

127.    Relators re-allege and incorporate by reference all paragraphs set forth above as if fully set forth herein.

128.    This is a civil action brought by Relators, on behalf of the United States of America, against Defendants pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1).

129.    By virtue of the acts described above, and in violation of the False Claims Act, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Government-Funded Healthcare Program known as Medicare to

29

officers, employees, or agents of the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

130.    For the reasons alleged herein, the claims were false or fraudulent because they were presented, or caused to be presented, for patients that were ineligible for hospice care under Medicare guidelines.

131.    The United States suffered damages as a result of false claims by Defendants and is entitled to recover its losses and obtain other relief available under the FCA.

132.    The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, including certifications, paid, and continue to pay, for these invalid claims for services that were provided to recipients of the Government-Funded Healthcare Program known as Medicare. If the Government had known about the violations, Medicare would not have paid for the claims.

133.    As a result of Defendants' actions as set forth above, the United States has been, and may continue to be, severely damaged.

**COUNT II**
**Violation of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

134.    Relators re-allege and incorporate by reference all paragraphs set forth above as if fully set forth herein.

135.    This is a civil action brought by Relators, on behalf of the United States of America, against Defendants pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1).

136.    By virtue of the acts described above, and in violation of the False Claims Act, Defendants in reckless disregard or deliberate ignorance of the truth or falsity of the information

30

involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records and/or statements to get false or fraudulent claims paid under the Government-Funded Healthcare Programs in violation of 31 U.S.C. § 3729(a)(1)(B).

137. For the reasons alleged herein, Defendants made or caused to be made numerous false records and statements, including false statements in claim forms that the claims met Medicare's requirements and that they comply with all applicable laws, regulations, and program instructions for payment. As a result of these false records and statements, false claims for payment were submitted to, and paid for by, the relevant Government-Funded Healthcare Programs.

138. The United States suffered damages as a result of false claims by Defendants and is entitled to recover its losses and obtain other relief available under the FCA.

139. The Government-Funded Healthcare Programs did not know the claims for payment were false because, among other things, the Government did not about Defendants' fraudulent conduct. If the Government had known, it would not have paid for the false claims the Defendants submitted for reimbursement.

140. As a result of Defendants' actions as set forth above, the United States has been, and may continue to be, severely damaged.

<u>COUNT III</u>
Violation of the
<u>Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*</u>

142. Relators reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

31

143.    Based on the foregoing allegations, Defendants are liable under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*

## COUNT IV
### Violation of the
### Tennessee Medicaid False Claims Act, Tenn. Code. Ann. § 71-5-181, *et seq.*

144.    Relators reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

145.    Based on the foregoing allegations, Defendants are liable under the Tennessee State Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

## COUNT V
### Violation of the
### Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

146.    Relators reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

147.    Based on the foregoing allegations, Defendants are liable under the Virginia State Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States, respectfully request:

A.   Leave to amend the Complaint when the amount of the damages has been fully ascertained and/or to conform to the facts discovered up to and including at the trial;

B.   Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, Tennessee FCA, Tenn. Code. Ann. § 71-5-181, *et seq.*, Virginia FCA, Va. Code. Ann. § 8.01-216.1, *et seq.*, and the Georgia FCA, Ga. Code Ann. § 49-4-168 *et seq.*;

C.   A determination that Defendants violated the False Claims Act and are liable to the United States;

D. An award to the United States of monetary damages equal to three times that suffered by the United States;

E. The assessment of civil monetary penalties against Defendants for each false claim to the United States;

F. An award to the State of Tennessee of monetary damages equal to three times that suffered by Tennessee;

G. The assessment of civil monetary penalties against Defendants for each false claim to the State of Tennessee;

H. An award to the State of Virginia of monetary damages equal to three times that suffered by the State of Virginia;

I. The assessment of civil monetary penalties against Defendants for each false claim to the State of Virginia;

J. An award to the State of Georgia of monetary damages equal to three times that suffered by the State of Georgia;

K. The assessment of civil monetary penalties against Defendants for each false claim to the State of Georgia;

L. An award to Relators of the maximum *qui tam* relator's share allowed pursuant to 31 U.S.C. § 3730(d);

M. An award to Relators of their expenses, attorneys' fees, and costs pursuant to 31 U.S.C. § 3730(d);

N. Pre-judgment interest at the highest rate allowed by law; and

O. Such other relief as is just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

33

Pursuant to Federal Rule of Civil Procedure 38(b), Relators demand a trial by jury on any issue triable of right by a jury.

September 6, 2023

THE UNITED STATES OF AMERICA
*Ex rel.* CHRISTOPHER MARSHALL AND
TAMMY STRINGER,

By: *Michael Hamilton*

Michael Hamilton
PROVOST UMPHREY LAW FIRM LLP
425 Hillsboro Pike, Suite 303
Nashville, TN 37215
Telephone: (615) 297-1932
mhamilton@provostumphrey.com

Michael J. Pendell*
Mathew P. Jasinski*
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
mpendell@motleyrice.com
mjasinski@motleyrice.com

Erin C. Williams*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
ecwilliams@motleyrice.com

Daniel J. Ocasio*
THE DANIEL J. OCASIO
WHISTLEBLOWER LAW GROUP
200 Massachusetts Avenue Northwest
Washington, DC 20001
Telephone: (202) 926-3235 ext. 102
docasio@djolawgroup.com

*pro hac vice* applications to be submitted

34

Pursuant to Federal Rule of Civil Procedure 38(b), Relators demand a trial by jury on any issue triable of right by a jury.

September 6, 2023

THE UNITED STATES OF AMERICA
*Ex rel.* CHRISTOPHER MARSHALL AND
TAMMY STRINGER,

By: *[signature]*

Michael Hamilton
PROVOST UMPHREY LAW FIRM LLP
425 Hillsboro Pike, Suite 303
Nashville, TN 37215
Telephone: (615) 297-1932
mhamilton@provostumphrey.com

Michael J. Pendell*
Mathew P. Jasinski*
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
mpendell@motleyrice.com
mjasinski@motleyrice.com

Erin C. Williams*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
ecwilliams@motleyrice.com

Daniel J. Ocasio*
THE DANIEL J. OCASIO
WHISTLEBLOWER LAW GROUP
200 Massachusetts Avenue Northwest
Washington, DC 20001
Telephone: (202) 926-3235 ext. 102
docasio@djolawgroup.com

*pro hac vice* applications to be submitted

34